HARRY L. SIEGEL et al., Appellees, v. CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, Appellant.

**TRIAL:** **Verdict—Disregard of Instructions.** A verdict against a common carrier for damages growing out of a shipment of animals is necessarily contrary to an instruction to the effect that the carrier would not be liable if the animals were infected with disease prior to and at the time of shipment, when the record testimony unquestionably shows that the animals were so infected. (See Book of Anno., Vol. 1, Sec. 11550, Anno. 272 *et seq.*)

**CARRIERS:** **Carriage of Live Stock—Construction of Statute.** The statutory provisions to the effect (1) that live stock shall be shipped at the highest practicable speed, etc., (2) that proof that the shipment was made according to time-tables will not show prima-facie compliance with the statute, and (3) that the railroad commissioners shall prescribe the speed of such shipment (Secs. 8114 to 8118, inclusive, Code of 1924), do not justify an instruction which, in effect, submits to the jury the question of the reasonableness of a freight-train schedule. These statutes contemplate the fixing of live-stock-shipping schedules *by the railroad commission,* with the attending presumption that such schedules will be reasonable.

**STATUTES:**    Construction—Legislative Titles.    Legislative acts must
3  be construed consistently with their titles.    Nor can they be given
   any broader scope than their titles.    (See Book of Anno., Vol. 1,
   Const., Art. III, Sec. 29, Anno. 4 *et seq.*)

**CARRIERS:**    Carriage of Live Stock—Damages—Double Measure.    A
4  shipper may be entitled to recover from a carrier for a delayed
   shipment damagés measured by the difference in value of the ship-
   ment immediately after the transportation, and such value as it
   would have been if the transportation had been without negligence;
   but he is not entitled, *in addition*, to any amount for care, feed,
   or medical services expended in order to render the shipment fit for
   the market.

**CARRIERS:**    Carriage of Live Stock—Delay—Nonrecoverable Damages.
5  In an action against a common carrier for damages to live stock,
   based solely on the claim that the carrier had been guilty of negli-
   gent delay in the shipment and that the delay had resulted in
   sickness of the stock, recovery may not be had for damages to
   *other* stock, strangers to the shipment, because such other stock
   contracted the same sickness by intermingling with the stock which
   had been shipped.

Headnote 1:   38 Cyc. p. 1891.   Headnote 2:   10 C. J. pp. 287 (Anno.),
305, 306.   Headnote 3:   36 Cyc. pp. 1029, 1134.   Headnote 4: ' 10 C. J.
pp. 309, 313, 314.   Headnote 5:   10 C. J. p. 313 (Anno.)

*Appeal from Louisa District Court.*—OSCAR HALE, Judge.

MARCH 16, 1926.

ACTION for damages for negligent delay in the shipment of
a carload of horses from Corydon to Morning Sun, Iowa.    There
was a verdict for the plaintiffs, and the defendant appeals.—
*Reversed.*

*H. O. Weaver, J. G. Gamble,* and *R. N. Lynch,* for appel-
lant.

No appearance for appellees.

 ̄ EVANS, J.—On March 21, 1922, the plaintiffs delivered to
the defendant at Corydon, Iowa, a carload of horses, compris-
ing 21 in number, for shipment to Morning Sun.    The horses
were loaded at Corydon at about 5 P. M., and were delivered at

Morning Sun at about 6 P. M. on March 23d. On the next morning after their delivery at Morning Sun, it was found that some of the horses were suffering from influenza. On the succeeding days, others were found similarly afflicted. The prevalence of this disease among the horses greatly affected their marketability and their market value. The plaintiffs in their petition charged not only negligent delay, but negligent handling and negligent exposure to rain and inclement weather. Upon the record before us, however, no support is furnished to any other claim of negligence than negligent delay. The trial of the case seems to have proceeded on that theory. The shipment was made in accordance with the regular schedule of freight trains operating on defendant's line, barring one possible exception. The first leg of the shipment was from Corydon to Allerton, a distance of about five miles. At Allerton, a junction was made with another branch of the defendant railway company, which extended from Trenton, Missouri, to Eldon, Iowa. Allerton was the terminus of a branch running from Valley Junction thereto. There was no regular freight train scheduled to leave Allerton for the east until 3:55 A. M. on March 22d. A special train, however, arrived at Allerton at 1:45 A. M. and picked up this car of stock and departed from Allerton at 2:30 A. M. This train arrived at Eldon at 7 A. M., this being the end of its division. Another train, however, was made up at Eldon, which took the car at 7:50 A. M., and arrived with it at Columbus Junction shortly before noon, March 22d. This was in advance of any regular schedule. At Columbus Junction, a junction was necessary with a north and south branch of the defendant's railway, extending from Cedar Rapids to Burlington. There was no regular freight train due out of Columbus Junction for Morning Sun until 2 A. M., March 23d. The car was held at Columbus Junction awaiting the arrival of such train, being No. 932. That train was unavoidably delayed between Cedar Rapids and West Liberty, so that it arrived at Columbus Junction two hours late. By that time it became evident that the shipment could not be delivered in Morning Sun upon that train without violating the 36-hour law. Thereupon, at 4:30 A. M. on March 23d, the horses were unloaded into the stockyards, and there fed and watered, as re-

quired by law.   They were reloaded, and the car was picked up by the next regular freight train, which delivered the consignment at Morning Sun at about 6 P. M.   Upon this state of facts the claim of negligent delay was predicated.   On the morning of March 24th, the plaintiffs discovered that some of their horses were afflicted with influenza.   The expert evidence on both sides was to the effect that influenza is both a contagious and an infectious disease.   It is taken into the system of the animal both through the respiratory organs and through the alimentary canal.   Its development is the development of its poisonous germ within the system.   The period of incubation after exposure is from 4 to 10 days.   In other words, the animal gives no sign of a contagion or infection for a period of 4 days or more after the exposure has taken place.   An earlier development may be obtained by a forcible injection of the poison into the veins of the animal.   In such a case, the symptoms of the disease might develop within a period of 2 days. The foregoing statement is sufficient, for the present, to enable the consideration of one or two questions which are pressed for our consideration.

I.   Instruction 12, given by the district court, was as follows:

"The defendant in this case would not be liable for any injury or damage to the stock in question arising from the inherent nature, sickness, vice, or natural propensity of the animals themselves, and the burden of proof is upon the defendant to show that the injury to these horses in question did so arise.   If the animals were infected, or some of them were so infected, previous to shipment, and that infection would have resulted in sickness of such horses in any event, without regard to any negligence of defendant, then the defendant company would not be liable for any injury to said horses from sickness, and you should so find."

1. TRIAL: verdict: disregard of instructions.

It is urged that the verdict of the jury was contrary to the foregoing instruction.   The only damage shown in this case is that arising out of the sickness of these animals.   The court put upon the defendant the burden of showing that the damage did so arise.   That fact appears without dispute from the testimony of both sides.   But in another instruction the

court laid upon the plaintiffs the burden of showing that their horses were in good condition when delivered for shipment. Such fact was testified to by one of the plaintiffs. The burden was then laid upon the defendant to show that their subsequent condition was not due to any negligence on the part of the defendant, but was due to a cause for which the defendant was not responsible. It is manifest that the horses could have been in good condition at the time of the shipment, and yet have been exposed to a contagion which resulted in the later influenza. The plaintiffs did not introduce any evidence that their horses had not been exposed to this disease prior to the shipment. On the contrary, it was made to appear by undisputed evidence that some of them had been exposed thereto. One black mare purchased of one Clark was especially identified by a veterinary as having been treated by him for the disease shortly before the shipment. He treated four other horses of the same owner's at the same time and for the same disease. Susceptibility to disease, especially to the contagious and infectious diseases, is inherent in live stock, and the carrier is not an insurer against such disease. Instruction 12 of the district court was correct in that respect. Upon the record before us, we see no escape from saying that some of these horses must have been exposed to this contagious disease prior to their delivery to the defendant company. If some of them were so exposed, this was sufficient to spread the contagion. Whether the exposure incident to the shipment would operate to the aggravation of the disease is a question we do not consider, because there is no basis for its consideration in the record. It must be held that the verdict was contrary to this instruction.

Such holding does not imply approval of Instruction 12 as a whole. Nevertheless, upon this record, it must be held also that no causal connection appears between the sickness of these horses and the delay in transportation. On the contrary, it appears affirmatively that the cause of this sickness necessarily antedated the delivery to the defendant for transportation.

II. Instruction 6, given by the district court, was as follows:

"In this connection, you are further instructed that it was the duty of defendant to move the car of horses at the highest

practicable speed consistent with reasonable safety and the
reasonable movement of its general traffic. The
burden of proof to show that such carload of
horses was so moved is upon the defendant,
and proof that such cars were moved according to schedule or
time-table is not prima-facie evidence that they were moved at
the highest practicable speed consistent with safety.''

2. CARRIERS: carriage of live stock: construction of statute

It will be noted that the effect of this instruction was to
submit to the jury the question of reasonableness of a freight-
train schedule. There was no evidence before the jury from
which it could judge the reasonableness of the schedule, except
the evidence of the operation of the schedule in this particular
shipment. The language of this instruction is to be found, in
substance, in Section 2157-s, Code Supplement, 1913. The in-
struction was undoubtedly given in purported obedience to
such section. If this section of the statute is to be so applied,
then its effect is far-reaching, and operates to render our statutes
inconsistent within themselves and repugnant to Federal legis-
lation. Trains must operate upon schedules. Public authority
must have power of regulation over such schedules. Subject
to such regulation, schedules must be followed,—at least, such
must be the objective. *Pine Bros. v. Chicago, B. & Q. R. Co.,*
153 Iowa 1. Because of the apparent consistency of the in-
struction with this section of the statute, and because of the
incongruity of the statute, as so applied, with other legislation,
a definite construction of the statute becomes quite imperative.

It will be noted that this section is found in a certain
Chapter 7, entitled ''Regulation of Carriers.'' Some of the
sections in this chapter are complete, as statutory regulations.
Other sections lay down standards for the guidance of the
railway commissioners. The last three sections in such chapter
are 2157-s, 2157-t, and 2157-u. These sections were first enacted
by the thirty-second general assembly as Chapter 115, consisting
of three sections. The first of such sections was amended by
Chapter 180 of the Acts of the Thirty-fifth General Assembly.
This amendment is indicated hereinafter by the use of italics.
These three sections of Chapter 115, Acts of the Thirty-second
General Assembly, as amended, were incorporated in the Code

Supplement of 1913, as here indicated (Sections 2157-s, 2157-t, and 2157-u). These sections are as follows:

"Sec. 2157-s. That it is hereby made the duty of all common carriers of freight within this state to move cars of live stock at the highest practicable speed consistent with reasonable safety, and the reasonable movement of its general traffic. *The burden of proof that cars of live stock are so moved shall be upon the carrier, and proof that such cars were moved according to schedule or time-table shall not be prima-facie evidence that they were moved at the highest practicable speed consistent with reasonable safety.*

"Sec. 2157-t. In order to enforce the duty prescribed in Section 1 [2157-s], the board of railroad commissioners shall immediately and from time to time investigate the practice of the common carriers with respect to the movement of live stock; and if it ascertains at any time that the common carriers or any of them are not moving cars of live stock with the proper speed, then upon notice to any such common carrier or carriers, the said board shall prescribe the speed at which and the conditions under which cars of live stock shall be moved within this state by any such carrier or carriers. The order shall specify the time at which it shall go into effect, which shall be as soon as, in the judgment of the board, the carrier or carriers affected can, with reasonable diligence, readjust its or their time-tables. The power to prescribe speed and determine conditions for the movement of cars of live stock within this state is hereby expressly conferred upon the said board of railroad commissioners.

"Sec. 2157-u. Any order, ruling or regulation made by the board under this act shall be enforcible as provided in Section 2119 of the Code."

It will be noted that Section 2157-t expressly confers power upon the board of railroad commissioners to enforce the preceding section by prescribing the schedules which may be maintained. Section 2157-u provides for the enforcement of the orders of the railroad commissioners pursuant to Section 2119. Section 2119 is the general statute which provides the method of enforcement of orders of the railroad commissioners. We hold, therefore, that Section 2157-s must be read and con-

strued in connection with Sections 2157-t and 2157-u. The effect of these sections is to take away from the railway company the arbitrary power to fix its own schedules. It must conform in that regard to the orders of the railroad commissioners, and schedules thus adopted must be deemed reasonable, within the meaning of the law. No other construction would secure a uniform operation of the statute. If the question of reasonableness were to be decided by the jury in each particular case, then a jury might find in favor of one shipper, that the schedule was unreasonable, and another jury find against another shipper, that the schedule was reasonable. This would result in palpable discrimination as between shippers, and this is under statutory condemnation. It is manifest, also, that it could never be practicable to bring before a jury, in the trial of a damage case, all the facts necessary to be considered in order to determine the reasonableness of a schedule, to say nothing of the want of capacity of a nonexpert to pass upon such a question. Moreover, the carrier cannot be under duty to obey the requirements of the railroad commissioners and at the same time under duty to disregard them.

Inasmuch as the exclusive power is conferred upon the railroad commissioners to prescribe or approve the schedules, such schedules must necessarily be deemed reasonable. Otherwise, the carrier is left without any guide on the one hand, and without any power of discretion of its own on the other hand.

That the legislative intent in the enactment of these sections was to define the duties of the railroad commissioners, is clearly indicated in the titles of the respective acts. The title to Chapter 115, Acts of the Thirty-second General Assembly, is as follows:

"An act to define the duty of common carriers of freight respecting the speed of cars of live stock, conferring additional powers upon the board of railroad commissioners with relation thereto, and providing for the enforcement of the orders, rulings and regulations of the board. [Additional to Chapter seven (7) of Title ten (X) of the Code.]"

Whereas the title to Chapter 180, Acts of the Thirty-fifth General Assembly, is:

"An act to amend the law as it appears in Section twenty-one hundred and fifty-seven-s (2157-s), Supplement to the Code, 1907, relating to the transportation of live stock."

Legislative acts must be construed consistently with their titles. Nor can they be given any broader scope than their titles, without rendering them unconstitutional. These acts, so construed, are rendered harmonious within themselves and consistent with other legislation. So construed, the amending Chapter 180, Acts of the Thirty-fifth General Assembly, seems to forbid the railroad commission's accepting existing schedules as *prima facie* reasonable. Impliedly, it seems to require from it an affirmative investigation of the question, with special reference to the shipment of live stock.

3. STATUTES: construction: legislative titles.

It follows that Instruction 6 should not have been given.

III. Instruction 14 set forth the following measure of damage:

"If you find the plaintiffs entitled to recover under the claims made in their petition, you will allow them, as damages to the 21 head in question, the difference, if any, between the fair and reasonable market value of said stock in the condition it was immediately after transportation, as shown by the evidence, and the fair and reasonable market value of said stock as it would have been had it been transported and delivered to plaintiffs without negligence. And if you further find that they were not, at the time received, in salable condition, by reason of negligence of defendant, you will allow plaintiffs such reasonable amount as shown by the evidence for care, feed, and medical services as was reasonably necessary, under the circumstances, to place said horses in a condition fit for the market."

4. CARRIERS: carriage of live stock: damages: double measure.

The appellant complains that the foregoing gave to the plaintiffs a double and cumulative measure of damage. The point is well taken. The first part of the instruction properly stated the rule of difference in fair and reasonable market value as it was immediately after the transportation, and such value as it would have been if the transportation had been without negligence. This rule is a very comprehensive one, and takes in the full scope of measure of damages. It is not necessarily

an exclusive rule, but when it is adopted, it covers the whole ground, and leaves nothing to be added thereto. If the damage had been of such a nature as to be reasonably capable of repair, then the reasonable cost of such repair might be laid down as a measure; but if such repair be had, then the remedy is complete. We do not assume to say that the plaintiffs were precluded from the adoption of either rule, but they were not entitled to take both.

IV.    The plaintiffs claimed damages not only to the 21 horses shipped by the defendant, but to 16 other horses which became infected by the same disease from the 21 horses transported by the defendant. The evidence was that the plaintiffs put the 21 horses into their barn at Morning Sun, wherein 16 other horses were then kept. About one week after the receipt of the 21 horses, and after the discovery of the prevalence of disease among them, the other 16 horses, or some of them, became afflicted with the influenza also. The plaintiffs claimed the same measure of damage for the injury done to such 16 horses. This claim was submitted to the jury. The court instructed the jury that it could not allow for this damage unless it first found the plaintiffs entitled to recover for damage to the 21 horses. It further instructed, in substance, that, if the jury found the defendant liable for damage to the 21 horses, it might also find it liable for damage to the 16 horses, unless the plaintiffs were guilty of contributory negligence in failing to isolate the diseased horses and failing to protect the 16 horses against the infection. If we assume, for the purpose of argument, that the defendant was liable for the presence of disease among the 21 horses, it would not follow that it would be liable for damages to the other 16 horses. The defendant's liability for damage to the transported horses would be predicated upon its duty as common carrier. It would be subject to the rules of evidence which obtain in such cases. It never sustained the relation of common carrier to the other 16 horses. If it were liable for injury to such 16 horses, the basis of liability would not be that of a common carrier, but that of any other tort-feasor. It would be under no burden of proof. The complete burden of proof would rest upon the plaintiffs. Of course, what we have

5. CARRIERS: carriage of live stock: delay: nonrecoverable damages.

already said in Division I as to the insufficiency of the evidence, as pertaining to the 21 horses, is also applicable here. But, in view of a possible new trial, it is important that the distinction as to the ground of liability be observed.

Other questions presented need not be considered. Some of them are not likely to arise upon another trial. In the absence of argument by the appellee, we are disposed to confine our consideration to as narrow a scope as we may properly do.

In view of the fact that defendant did not meet its schedule, such as it was, we do not pass upon the question of negligent delay. Whether the defendant ought to have unloaded the horses at Columbus Junction at an earlier hour, so that it could have complied with the law, and yet have availed itself of the belated train No. 932, is a question the consideration of which would serve no function, upon the present record.

For the reasons indicated, the judgment of the district court must be reversed.—*Reversed.*

DE GRAFF, C. J., and ALBERT and MORLING, JJ., concur.